IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| DALE RICHARD UPTEGROVE, ) | Case No. 09-60244 |
| ) | |
| Debtor. ) | |
| ) | |
| COMMUNITY BANK OF THE ) | |
| OZARKS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 09-6091 |
| ) | |
| DALE RICHARD UPTEGROVE, ) | |
| ) | |
| Defendant. ) | |

ORDER DIRECTING JUDGMENT IN FAVOR OF PLAINTIFF

Community Bank of the Ozarks d/b/a Community Bank of Pleasant Hope seeks a determination that Debtor Dale Richard Uptegrove's debt to it, which stems from a construction loan, be declared nondischargeable under 11 U.S.C. § 523(a)(2)(A). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons that follow,

judgment will be entered in favor of the Bank.

## FACTUAL BACKGROUND

According to the Bank's representative who testified at trial, the Debtor had been a good customer of the Bank for some time prior to May 2007, when the Debtor approached the Bank about a commercial loan to finance the construction of a spec house on certain real estate that the Debtor owned. In June 2007, the Debtor submitted a Commercial Loan Application for the financing of construction of the spec house on Golden Valley Lot 6 in Fair Grove, Missouri ("Lot 6").[1] In connection with that Application, the Debtor submitted to the Bank a personal financial statement,[2] income tax returns,[3] and estimates for the construction of the house on Lot 6.[4] The Bank ran the Debtor's credit report and obtained title information and appraisals on the property.[5]

The Bank's representative testified that the Bank had a conservative asset-based

---

[1] *See* Commercial Loan Application Summary, Plaintiff's Ex. 10.

[2] The Financial Statement showed that the Debtor had total "productive assets" of over $6 million, and total liabilities of about $3 million, for a net worth of a little over $3 million. It also showed total annual income of approximately $600,000, and annual expenses of $340,000. *See* Plaintiff's Ex. 11.

[3] The Debtor's 2006 federal income tax return showed adjusted gross income of $451,228. *See* Plaintiff's Ex. 12.

[4] The Job Cost Estimate showed a total estimated cost, minus land/road/survey, of $180,890. *See* Plaintiff's Ex. 15.

[5] Plaintiff's Ex. 37 and 38.

lending policy whereby it would only lend money on real estate up to a 90% loan to value. Although the Debtor was creditworthy, the Bank initially declined his loan application because of insufficient loan to value. The Debtor responded to the Bank's decision by threatening to contact an attorney because he believed that the Bank had committed to making the loan when it ordered title work. At the time, the Debtor had already commenced construction on the site and had, in fact, completed the concrete foundation.

At that point, the Bank reconsidered the Debtor's Application and agreed to make the loan, in part due to the fact that the Debtor was a good customer at the Bank, and in part as a response to the Debtor's threat to contact an attorney. On June 12, 2007, the Debtor executed a promissory note in favor of the Bank in the amount of $185,000, for the construction of a house on Lot 6. The note had an initial maturity date of December 12, 2007, although that date was subsequently extended a couple of times. The note was secured by a deed of trust on Lot 6, as well as a second lot, Golden Valley Lot 4, on which the Debtor was apparently planning to build another spec house. The Bank recorded the deed of trust on June 18, 2007.

The promissory note itself provided for an initial draw in the amount of $13,120.08. In addition, the Debtor immediately submitted his first draw request, in the amount of $33,716, which he represented included $10,095 for the concrete

3

foundation on Lot 6 which had already been completed and paid for, a $5,000 contractor fee to be paid to the Debtor's nephew, Michael Uptegrove, who was the contractor on the job, and $18,621 for materials.[6] In addition, that same day, the Debtor requested a third draw, in the amount of $37,806.76, to be paid to Buffalo Discount Building Materials, representing to the Bank that those funds would be used to purchase materials to start building the house on Lot 6. Based on those requests, the Bank issued two cashier's checks, the first in the amount of $33,716, made payable to the Debtor, and the second, in the amount of $37,806.76, made payable to Buffalo Discount Building Materials.[7] Thus, as of June 13, 2007, the Debtor had drawn over $84,000 on the loan.

Other than the cashier's checks for the initial draw requests made when the loan was first opened, the practice was for the Debtor to deposit draws from the loan into a specific checking account designated for the construction on Lot 6, and then Dale or another authorized signor would write checks as needed. By about February 2008, the Debtor had drawn nearly the entire balance of the loan. However, construction of the house was never completed. In fact, the Bank's representative testified that it is currently little more than a shell, and will require an additional $100,000 to complete.

---

[6] *See* Plaintiff's Ex. 16. The Bank's representative recalled that the "materials" may have consisted of gravel to fill in the foundation.

[7] Plaintiff's Ex. 17 and 18.

On May 19, 2008, Buffalo Discount Building Materials filed a Petition on Mechanic's Lien and Account in the Circuit Court of Polk County, Missouri, relating to Lot 6, naming the Debtor and the Bank as defendants. After the Debtor filed for bankruptcy protection on February 12, 2009, the Debtor removed the mechanic's lien action to this Court. In October 2009, the parties settled that action, with the Bank paying Buffalo Discount Building Materials $11,000 to release its mechanic's lien. Subsequently, the Bank conducted a foreclosure sale on November 30, 2009, at which it was the successful bidder with a credit bid of $75,000.

The Bank's nondischargeability action against the Debtor is premised on the allegation that, rather than using the loan proceeds to construct the house on Lot 6 as the Debtor represented to the Bank he would do, much of the proceeds went to other projects and items unrelated to the construction on Lot 6. Most of the evidence on this issue, discussed below, related to how payments to Buffalo Discount Building Materials were directed.

## DISCUSSION

Section 523(a)(2)(A) provides that a discharge under § 727 does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false

5

representation, or actual fraud."[8]

> In order to prevail under § 523(a)(2)(A) on the basis of actual fraud, a creditor must prove: (1) the debtor made a false representation; (2) at the time the representation was made the debtor knew it was false; (3) the debtor subjectively intended to deceive the creditor at the time he made the representation; (4) the creditor justifiably relied upon the representation; and (5) the creditor was damaged.[9]

Although Debtor's counsel appeared at the trial and defended the Debtor, including cross-examining the Bank's witnesses, the Debtor himself did not appear or testify at trial. As a result, the uncontroverted evidence at trial was that the Debtor represented to the Bank that he was using the loan proceeds to pay for the materials and construction of the house on Lot 6. In addition, the representative from Buffalo Discount Building Materials testified that it was the Debtor who directed Buffalo Discount to apply the payments coming from the loan proceeds to his other open accounts. As a result, the Debtor's representations to the Bank were false, and he subjectively knew it. In addition, the evidence supports the finding that the Debtor intended to deceive the Bank in making the false representations because the Bank would not fund the draws if it knew the money was not going into the house on Lot 6. And, the Bank was clearly damaged as a result because, as discussed in detail

---

[8] 11 U.S.C. § 523(a)(2)(A).

[9] *Treadwell v. Glenstone Lodge, Inc. (In re Treadwell)*, 423 B.R. 309, 313-14 (B.A.P. 8th Cir. 2010) (citation and internal quotation marks omitted).

below, some of the funds were not used to construct the house. The only real issues, therefore, are whether the Bank's reliance on the Debtor's statements that he was using the proceeds for Lot 6 was justifiable, and the amount of the Bank's damages.

### *Justifiable Reliance*

In *Treadwell v. Glenstone Lodge*, the Eighth Circuit Bankruptcy Appellate Panel recently emphasized the minimal standard that the Supreme Court intended when it held that justifiable reliance, as opposed to reasonable reliance, is the standard for actual fraud under § 523(a)(2)(A).[10]

> Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."[11]

Here, the Bank's representative testified that the Bank first learned that the loan funds were being used to pay other accounts at Buffalo Discount through interrogatories in the mechanic's lien action. At the time the Debtor was making draw requests, the Bank apparently did very little to verify that the proceeds were being used toward construction of the house on Lot 6. It apparently required no lien

---

[10] *Id.*

[11] *Field v. Mans*, 516 U.S. 59, 70-71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995) (*quoted by Treadwell*, 423 B.R. at 314).

waivers, no invoices, and only once went to the site to verify progress. The Bank's representative testified that the one time he went to the site, he became concerned that the progress did not match the status of the draws. He testified that he expressed his concerns to the Debtor, who responded that "it was not an issue," and that he would finish the project and get the property sold. Apparently, the Bank's representative simply believed the Debtor.

The BAP reiterated in *Treadwell* that a creditor has no duty whatsoever to investigate the truth of a debtor's representations: "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation."[12] Hence, the fact that the Bank essentially made no investigation, and requested no documentation to evidence that the loan funds were being used as represented, does not render the Bank's reliance unjustifiable.

However, "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious."[13] Clearly, the Bank did not know that the representations were false; otherwise, it would not have funded the draw requests. In addition, the falsity was not obvious and there were

---

[12] *Id.* at 314 (*quoting* Rest.2d Torts § 540).

[13] *Id.* (*quoting* Rest.2d Torts § 541).

8

no red flags which should have put the Bank on notice of the falsity of the representations.[14]

Finally, I recognize that the Supreme Court has said that "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff" and that a plaintiff such as the Bank would typically be considered relatively sophisticated. However, in *Treadwell*, the plaintiff was a large lodge with significant experience in hosting large conventions such as the one planned by the debtor in that case. The debtor was an unsophisticated woman with no experience in hosting large conventions. Nevertheless, the BAP held that the plaintiff's reliance on her promises to pay, despite repeated failure to do so by the required deadlines, was justifiable in large part because she appeared to be associated with the Red Hat Society, a reputable organization. Here, although the Bank is a sophisticated and conservative lender, the Debtor was a good customer and at least appeared to have experience in constructing spec houses. Therefore, as the BAP did in *Treadwell*, I find that, even though the Bank's experience might be expected to have caused it to verify that the loan funds were being used for construction on Lot 6, its reliance on the Debtor's representations

---

[14] *Id.* at 315 (stating that the "red flag" theory is essentially limited to "extreme situations such as the one-eyed horse or where a debtor tells the creditor he will not be able to repay his debt.").

9

was justifiable under the standard set out in *Treadwell*.[15]

## *Damages*

At trial, the Bank requested damages in the approximate amount of $117,429.45, calculated as follows: As of the date of the filing of the petition on February 12, 2008, the Debtor owed the Bank $181,429.45 on the loan. The Bank purchased the property at the foreclosure sale by credit bidding $75,000. Thus, it says it is owed $106,429.45 on the loan. In addition, the Bank seeks reimbursement for the $11,000 it paid to settle the mechanic's lien, for a total of $117,429.45, plus attorneys' fees.

However, only the portion of the debt which resulted from the Debtor's fraud, *i.e.,* the money that the Debtor directed to items other than construction on Lot 6, is nondischargeable. On those damages, the unrefuted evidence was that the June 13, 2007 draw of $37,806.76, made payable to Buffalo Discount Building Materials, was, at the Debtor's direction, applied to pay other open overdue accounts at Buffalo Discount, and none of it went toward construction on Lot 6.[16] In addition, on July 13,

---

[15] *In re Treadwell*, 423 B.R. at 316 ("Glenstone is entitled to have Carole's debt to it excepted from her discharge despite the fact that its employees made an enormous mistake by trusting her.").

[16] In addition to the testimony of the representative from Buffalo Discount Supply, see *Answers of Plaintiff, Buffalo Discount Building Materials, to Defendant Community Bank of the Ozarks' First Set of Interrogatories*, Plaintiff's Ex. 8, at ¶ 6.

2007, the Debtor's then-girlfriend, Suzann Baxter, who was working for the Debtor in connection with the construction on Lot 6, wrote a check out of the Lot 6 construction checking account, made payable to Discount Building Supply, in the amount of $13,566.60.[17] Of that amount, $11,696.22 went to pay down the Lot 6 account at Buffalo Discount Materials, but the rest, totaling $1,870.38, went to pay other accounts.[18] And, the Bank's representative testified that this allocation of the payment was made at the Debtor's direction. The $1,870.38 is, therefore, nondischargeable. Thus, with the $37,806.76 discussed above, the evidence showed that the Debtor directed a total of $39,677.14 in payments to Buffalo Discount to go to other accounts. That amount is nondischargeable.

As to the remainder, the Bank suggested at the trial that some materials paid for under Discount Building's Lot 6 account were not actually used on Lot 6. However, there was no specific evidence to support that allegation. Indeed, Buffalo Discount's representative testified that its practice was that, when the someone placed an order for materials under an account for a particular job, those materials were delivered to

---

[17] Plaintiff's Ex. 25.

[18] *See Answers of Plaintiff, Buffalo Discount Building Materials, to Defendant Community Bank of the Ozarks' First Set of Interrogatories*, Plaintiff's Ex. 8, at ¶¶ 7-8. Note that the Answer to question 8(a) refers to "Golden Valley *Lot 61* c/o Dale Uptegrove." However, Buffalo Discount's List of Accounts for Dale Uptegrove, which is a part of Plaintiff's Exhibit 8, does not list an account relating to "Lot 61." It is apparent, therefore, that the Answer to question 8(a) was intended to refer to "Lot 6," not "Lot 61."

that job. If the allegation is that the Debtor or someone at his direction took materials which had been delivered to Lot 6 to use on another job site, there was no evidence of that. In addition, the Bank's representative said that there is, in fact, a structure on Lot 6, even though it is basically a "shell." Clearly, at least some of the materials delivered from Buffalo Discount were used on Lot 6, and there is no actual evidence as to what other materials might have been diverted, and at whose direction. As the Bank bears the burden of proof on damages, and there was no actual evidence that materials delivered to Lot 6 were not actually used on Lot 6, I find that none of the other payments to Buffalo Discount related to the Debtor's fraud and are, therefore, dischargeable.

Next, as part of the initial draw request on June 12, 2007, to reimburse the Debtor for expenses he had already expended on Lot 6, the Debtor submitted to the Bank an invoice for concrete for in the amount of $10,095. At trial, the Bank suggested that the Debtor had already been paid on that same invoice, by another bank, on another construction job.[19] However, the evidence was that the Debtor had, in fact, already completed the foundation when the loan was made. In addition, the job cost estimate he supplied when he applied for the loan contained a line item for

---

[19] *See* Supporting Documents to Statement of Account on Bank of Missouri Loan #119431 (Plaintiff's Ex. 34).

"concrete/foundation" in the amount of $10,160. Therefore, although the Debtor may have submitted the same invoice to another bank on another job, the evidence was that a concrete foundation was, in fact, done on Lot 6. As a result, the Bank was not damaged by the Debtor's using loan funds to reimburse himself for that invoice. Similarly, keeping in mind that the Bank bears the burden of proving its damages, there was no evidence that the Debtor did not pay $5,000 to his nephew as part of his contractor's fee on Lot 6, or that the $18,621 did not go to pay for "materials" on Lot 6.

Although the Bank's representative testified that it will take $100,000 to complete construction of the house, and thus it would appear that that much more than the $39,677.14 went somewhere other than construction of the house on Lot 6, the Bank did not meet its burden of proving that the Debtor actually caused any more than the $39,677.14 to be diverted to projects other than Lot 6. As to the $11,000 paid to Discount Builders to settle the mechanic's lien action, that amount has already been accounted for as part of the $39,677.14.

The Bank also seeks a nondischargeable judgment for its attorney's fees.[20] Pursuant to the terms of the promissory note, the Debtor agreed to pay all costs of

---

[20] I note that the Complaint did not seek attorneys' fees, and no amendment has been requested. However, since the Bank introduced evidence of its fees without objection, the Debtor impliedly consented to that issue being included. *See* Fed. R. Civ. P. 15(b), made applicable here by Fed. R. Bankr. P. 7015.

13

collection in the event of a default, as well as attorneys' fees and court costs as permitted by law.[21] The Bank submitted an invoice detailing the attorneys' fees incurred in connection with this case, which showed professional fees totaling $38,341.80, plus costs of $4,258.50. I have reviewed the fees and they appear to be reasonable. As a result, the judgment will include such fees and costs. Further, fees provided by contract can be included as part of a nondischargeable debt under section 523(a)(2)(A).[22] However, when only a portion of the total judgment is declared to be nondischargeable, courts have held that attorneys' fees are nondischargeable in the same proportion as the compensatory damages are held to be nondischargeable.[23] Thus, as 33% of the Bank's judgment is nondischargeable, 33% of the attorneys' fees, or $14,058.10, are also nondischargeable.

The Clerk of the Court is DIRECTED to enter Judgment in favor of the Bank in the amount of $117,429.45, plus attorneys' fees and costs in the amount of

---

[21] Plaintiff's Ex. 23.

[22] *Merchants Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 795 (B.A.P. 8th Cir. 1999) (citing *In re Alport*, 144 F.3d 1163, 1168 (8th Cir. 1998); *In re Hunter*, 771 F.2d 1126, 1131 (8th Cir. 1985)). *See also Cohen v. de la Cruz*, 523 U.S. 213, 214, 118 S.Ct. 1212, 1214 (1998).

[23] *See Integrated Practice Mgmt Inc. v. Olson (In re Olson)*, 325 B.R. 791, 802 (Bankr. N.D. Iowa 2005) (citing *Green v. Pawlinski (In re Pawlinski)*, 170 B.R. 380 (Bankr. N.D. Ill. 1994)). *See also In re Hunter*, 771 F.2d 1126, 1131 (8th Cir. 1985) (holding that the plaintiff may be entitled to recover attorneys' fees ancillary to the portion of the debt that was nondischargeable, "or those charges may be subject to apportionment between the dischargeable and nondischargeable parts of the underlying indebtedness.'").

$42,600.30. Of that amount, $39,677.14, plus attorneys fees in the amount of $14,058.10, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

    IT IS SO ORDERED.

                                      <u>/s/ Arthur B. Federman</u>
                                          Bankruptcy Judge

Date: 6/18/2010

Copy to: Christopher F. Weiss
        Gabrielle A. J. Beam
        P. Glen Smith
        David E. Schroeder